UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 22-CV-20519-ALTMAN/REID

DERRICK J. WALTON,

    Plaintiff,

v.

KILOLO KIJAKAZI,
Acting Commissioner of Social Security,

    Defendant.

_____/

**REPORT AND RECOMMENDATION
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

    This matter is before the Court on Derrick J. Walton's Motion for Summary Judgment and Defendant Kilolo Kijakazi, Acting Commissioner of Social Security's ("Commissioner") Motion for Summary Judgment [ECF No. 12, 14]. These motions were referred to the Undersigned by the Honorable Roy K. Altman for a Report and Recommendation. [ECF No. 11]. For the reasons stated below, the Undersigned **RECOMMENDS** Plaintiff's Motion for Summary Judgment be **DENIED**, Defendant's Motion for Summary Judgment be **GRANTED**, and the Administrative Law Judge's ("ALJ") decision be **AFFIRMED**.

    **I.**    **PROCEDURAL BACKGROUND**

    Plaintiff Derrick J. Walton appeals the denial of his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). Plaintiff filed both applications on

January 23, 2019, alleging an onset date of August 25, 2017. [R. 20].[1] Following the denial of his claim at the initial and reconsideration levels, Plaintiff requested an administrative hearing before an administrative law judge ("ALJ"). [R. 20]. Plaintiff's request was granted, and a telephonic hearing was held on June 14, 2021, before ALJ Tracey B. Leibowitz. [R. 20, 32]. Plaintiff was represented by counsel and both he and a Vocational Expert ("VE") testified at the hearing. [R. 20]. On June 29, 2021, the ALJ issued her unfavorable decision finding that Plaintiff was not disabled under sections 216(i), 223(d) and 1614(a)(3)(A) of the Social Security Act. [R. 32]. Plaintiff appealed the ALJ's decision to the Appeals Council, which denied his request for review. [R. 6–8]. Plaintiff now seeks judicial review of the ALJ's decision, and both Parties moved for summary judgment. [ECF No. 12, 14]. Plaintiff has exhausted his administrative remedies, and the case is ripe for review under 42 U.S.C. § 1383(c).

## II. STANDARD OF REVIEW

### A. Legal Principles

A district court's review of the Commissioner's decision is limited to determining whether the decision as a whole is supported by substantial evidence in the record. *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). Substantial evidence is defined in this context as relevant evidence which a reasonable person would accept as adequate to support the conclusion reached. *Williams v. Astrue*, 416 F. App'x. 861, 862 (11th Cir. 2011). In determining whether substantial evidence exists, the court must scrutinize the record in its entirety, taking into account evidence favorable as well as unfavorable to the Commissioner's decision. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995).

---

[1] All references to "[R. __ ]" are to the record of the administrative proceeding filed by the Commissioner at ECF No. 10.

If the Commissioner's decision is supported by substantial evidence, then the reviewing court must affirm the decision, even if proof preponderates against it. *Dyer*, 395 F.3d at 1210. The reviewing court cannot reweigh the evidence or substitute its judgment for that of the Commissioner. *Id.* This restrictive standard of review, however, applies only to findings of fact. No presumption of validity attaches to the conclusions of law found by the Commissioner, including the determination of the proper standard to be applied in reviewing claims. *Brown v. Sullivan*, 921 F.2d 1233, 1236 (11th Cir. 1991). The failure by the Commissioner to apply the correct law or to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal. *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991).

**B. Regulatory Framework**

A claimant must be "disabled" to be eligible for social security benefits. 42 U.S.C. § 1382. A claimant is disabled if he is unable to "engage in any substantial activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A). A "physical or mental impairment" is one that "results from anatomical, physiological or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382c(a)(3)(D).

A claimant bears the burden of proving that he is disabled. *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999); 20 C.F.R. §§ 404.1512(a), 416.912(a). The Social Security regulations outline a five-step sequential evaluation process for deciding whether a claimant is disabled: (1) whether he is currently engaged in substantial gainful activity; (2) whether he has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the

severity of a specified impairment in the Listing of Impairments; (4) whether he can perform his past relevant work despite his impairments; and (5) whether he can perform other work found in the national economy. *Brightmon v. Soc. Sec. Admin., Comm'r*, 743 F. App'x 347, 351 (11th Cir. 2018); 20 C.F.R. §§ 404.1520(a)(4)(i)–(v), 416.920(a)(4)(i)–(v).

### III. THE RECORD

#### A. Plaintiff's Testimony

Plaintiff was 27 years old on the date of the ALJ's decision. [R. 17, 257]. He testified he has suffered from epilepsy since 2013. [R. 56]. He has a high school education and has worked as a forklift operator, dining room attendant, trash collector, and trash collector driver. [R. 49]. Plaintiff alleged disability due to epilepsy, migraine, foot pain, depression, and anxiety. [R. 308, 335].

Plaintiff testified he experiences 3 to 6 seizures per month. [R. 51]. He testified he does not feel like himself after a seizure and is in a bad mood and feels tired. [R. 51–52]. He claimed he would feel this way for a couple of days. [R. 53]. Regarding work, Plaintiff stated he worked in 2020 for six months, setting up tables and chairs for events. [R. 46]. He stopped working due to his seizures. [R. 46–47].

Regarding his daily living activities, Plaintiff testified that the day before his hearing, he awoke at 8 o'clock, ate breakfast, and played with his son. [R. 59]. Later that day, he took a nap, watched T.V. at 5 o'clock, and talked with his mother around 7 o'clock. [R. 59]. He testified he went to sleep around 9:30 to 10:00 P.M. [R. 59].

#### B. Medical Evidence

##### i. November 2018

In November 2018 Plaintiff was hospitalized after he suffered two seizures. [R. 481–96]. Hours before the seizures, law enforcement had arrested Plaintiff for his involvement in a car accident. [R. 481]. According to the medical report, bystanders at the scene of the accident saw Plaintiff had been huffing or smoking something before crashing his car into a building. [R. 481]. Plaintiff was taken to the emergency room for medical clearance but showed no symptoms and refused care. [R. 481]. Once discharged, Plaintiff was taken to jail, where he suffered the first seizure. [R. 481]. As he was being transported back to the hospital, Plaintiff suffered a second seizure, which lasted about 30 seconds. Both seizures were witnessed by emergency medical service workers. [R. 481].

Upon admission, Plaintiff was slightly sleepy, but was able to answer to simple questions and had full range of motion of all his extremities. [R. 483]. He did not have any focal weakness, and his cranial nerves were grossly intact. [R. 483]. Plaintiff was treated with Keppra. [R. 492]. Plaintiff reported he was not taking his medications. [R. 494]. The physical examination performed at the time of discharge revealed Plaintiff had 5/5 strength throughout and intact sensation. [R. 495]. During the hospitalization, Plaintiff was diagnosed with mild cannabis use disorder and tested positive for cannabinoids. [R. 484]. Plaintiff was diagnosed with seizures, polysubstance abuse, and non-compliance with medications, and was prescribed Levetiracetam. [R. 493]. The brain MRI scan and ECG performed on November 29, 2018, were unremarkable [R. 494].

  ii.  **Consultative Medical Examiner**

Sarah Shortridge, D.O., a consultative examiner, examined Plaintiff in May 2019. [R. 401–04]. Plaintiff reported during his examination that he had had three seizures over the last two days. [R 401]. Dr. Shortridge noted Plaintiff had linear and logical thought process. [R. 402]. Plaintiff sat comfortably during the interview and was able to ambulate without assistance. [R. 402]. He

5

had a normal gait and was able to squat without difficulty. [R. 403]. Plaintiff had 5/5 strength in the upper and lower extremities. [R. 403]. Dr. Shortridge diagnosed epilepsy and former marijuana use and advised Plaintiff to seek medical attention given his report of 3 seizures over the last 48 hours. [R. 403].

### iii. May 2019 to June 2020

Shortly after, Plaintiff was seen at A Plus Family Care for evaluation of his seizures [R. 593-95]. Plaintiff reported that his last seizure had occurred one month earlier. [R. 593]. Notably, he reported he had been out of medication for one week. [R. 593]. Plaintiff had 5/5 muscle strength in the upper and lower extremities bilaterally. [R. 594]. He also had normal gait and intact sensation [R. 594]. Plaintiff was prescribed a 30-day supply of Keppra and referred to neurology for chronic care management. [R. 593-95]. In August 2019, Plaintiff was seen again at A Plus Family Care, this time for left shoulder pain after falling while having a seizure. [R. 596]. Plaintiff was prescribed a 30-day supply of Keppra at the time [R. 597].

Plaintiff received treatment for seizures in November 2019, February 2020, and March 2020. [R. 443, 437, 429]. In April 2020, Plaintiff reported having had two seizures in March 2020 during his primary care visit. [R. 599]. He was prescribed a 90-day supply of Keppra. [R. 597].

In June 2020, Plaintiff received emergency room treatment after he reported having had two seizures that day. [R. 618]. He reported that his mother had found him on the sidewalk after the last seizure, and he reported that he had lost continence. [R. 618]. He did not report a baseline seizure frequency. [R. 618]. He reported that he was on Keppra. [R. 618]. Upon examination, Plaintiff had normal gait, sensation, and reflexes. [R. 619]. The extremity examination was within normal limits. Plaintiff was alert and oriented. [R. 619]. A brain computer tomography (CT) scan

was unremarkable. [R. 617]. Plaintiff was diagnosed with seizures and discharged with prescriptions for Ativan and Keppra. [R. 623].

### iv. Treating Physician, Kamil Detyniecki, M.D.,

In June 2020, Kamil Detyniecki, M.D., a neurologist, saw Plaintiff via telemedicine for commencement of neurological care for seizures. [R. 588]. Plaintiff reported that he started having staring spells at 15 and had his first convulsive seizure at 15. [R. 588]. He reported that he was having seizures consisting of staring spells and convulsions with a frequency of 2 to 3 each per month. [R. 589). Dr. Detyniecki increased Plaintiff's Levetiracetam dose and ordered an EEG and MRI scan. [R. 590].

### v. July 2020 to April 2021

In July 2020, an EEG revealed frequent sharp waves over the left anteriotemporal region that were consistent with the cortical hyperexcitability associated with an increased risk of seizures in that region. [R. 585]. In September and October 2020, Plaintiff continued to report a seizure frequency of 2 to 3 of each type (staring episodes and convulsive) per month at neurology telemedicine visits. [R. 579, 581-82). During the September 2020 visit, he reported that he had experienced two seizures since the last visit. [R. 582].

In November 2020, a brain MRI scan revealed a T1 hyperintense area in the pituitary gland that may have represented a hemorrhagic microadenoma versus Rathke's cleft cyst. Further evaluation with imaging was recommended. [R. 575-76].

In January 2021, Plaintiff reported having 2 to 3 seizures of each type (staring episodes and convulsive) per month during a follow-up neurology visit with Dr. Detyniecki. [R. 571-72]. Plaintiff's medication was switched to Oxcarbazepine, and he had not reported improvements. [R. 573]. His doses of Oxcarbazepine were increased. [R. 572-73].

In April 2021, Plaintiff reported he had two general tonic clonic seizures in the past month, but none since. [R. 635]. He also reported he had a couple of staring episodes since the last visit. [R. 635]. He reported that he had not taken the recommended increased dose of Oxcarbazepine that had been prescribed in the last visit. [R. 635]. The treatment plan for the seizures continued to be an increased dose of Oxcarbazepine. [R. 637].

### C. Vocational Expert

At the hearing before the ALJ, the VE testified that Plaintiff's past jobs as a forklift operator and trash collector were performed at a medium level. [R. 65]. The VE acknowledged that that kind of work was unavailable based on exertional levels alone. [R. 66]. As hypothetical 1, the ALJ asked the VE whether an individual with Plaintiff's limitations would be able to perform any work in the national economy. [R. 66]. The VE responded that such an individual could perform light work, such as ticket-taker, cashier, or school bus attendant. [R. 66]. As hypothetical 2, The ALJ asked whether the VE's opinion would change if the individual missed two or more days per month. The VE responded:

> According to studies by the U.S. Department of Labor in unskilled work it's one unexcused or unanticipated absence per month, but I should note that, from my experience of trying --and doing job analysis, working with employers and, you know, the case manager, during a probationary period of an unskilled job -- well, and in unskilled jobs, oh, the employee cannot miss any time from work. Probationary periods generally last from two to three months.

[R. 66]. Plaintiff's counsel then asked the VE how long an employee could remain off-task. [R. 66]. The VE responded, "15 percent according to studies by the U.S. Department of Labor and that includes the 3 normally allotted breaks that they must provide for employees workplace." [R. 67]. At the conclusion of the hearing, Plaintiff's counsel argued that Plaintiff "would be absent several times a month and as the vocational expert stated, that would be work-preclusive. And also, Judge, my client should be found disabled due to his medically-determinable impairments."

8

[R. 67].

### D. ALJ's Findings

The ALJ found Plaintiff engaged in substantial gainful activity between January 2020 and March 2020. [R. 23]. The ALJ cited a new hire query which showed that Plaintiff earned $4,488.00 in the first quarter of 2020 while working for "Cristina's Party Rentals." [R. 23]. But since then, there had been continuous 12-month periods during which Plaintiff did not engage in gainful activities. [R. 23]. The ALJ therefore made additional findings addressing the periods Plaintiff did not engage in substantial gainful activity.

First, the ALJ found that Plaintiff suffered from epilepsy, a severe impairment under 20 C.F.R. §§ 404.1520(c) and 416.92(c). [R. 23]. His other impairments of major depressive disorder, mild cannabis use disorder, and insomnia, however, caused no more than minimal limitations to his ability to perform basic mental work and were therefore not severe. [R. 23].

Second, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment in the Commissioner's Listings. [R. 24].

Third, the ALJ concluded Plaintiff retained the residual functional capacity to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b) subject to certain non-exertional limitations. [R. 25]. Plaintiff, for instance, could not be exposed to hazards, including moving mechanical parts, and he could never climb ladders, ropes, or scaffolds. Plaintiff could tolerate occasional exposure to extreme cold and extreme heat. [R. 25]. The ALJ concluded that although Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, Plaintiff's statements regarding the intensity, persistence, and limiting effects of these

symptoms were not entirely consistent with the medical evidence and other record evidence. [R. 28].

The ALJ explained that the RFC assessment was supported by the evidence of his epilepsy, which in turn were supported by EEG findings. [R. 30]. She wrote that "the neurology treatment notes do not document any post seizure symptoms to support Dr. Detyniecki's opinion that the claimant must rest for 24 hours after a seizure." [R. 30]. And records from April 14, 2021 showed that Plaintiff had only experienced two general clonic seizures since the last visit in January 2021 "despite not taking the recommended dose in the prior visit." [R. 30]. The ALJ noted that while Dr. Detyniecki's 2020-2021 treatment notes showed that Plaintiff reported an average seizure frequency of 2 to 3 of each type of seizure, he had only reported specific occurrences during the April 2021 visit. [R. 30]. The ALJ explained the RFC determination was further supported by Plaintiff's seizure logs for 2019 through 2021, which showed he experienced mostly 1 to 2 seizures per month, with the exception of a September entry.

The ALJ also noted that, in 2018 when Plaintiff had two seizures after being involved in a car accident, he reported to medical personnel that he was non-compliant with his medication. [R. 26]. In 2019, when he was seen at a clinic for evaluation of his seizures, he reported he had been out of medication for one week. [R. 27]. And in 2021, during a follow-up neurology visit, he reported that he had not taken the recommended increased dose of Oxcarbazepine that he had been prescribed in the last visit. [R. 28]. Based on this, the ALJ concluded that "the evidence of noncompliance with medication also is inconsistent with the claimant's allegations that the seizures occur despite his taking the medications as they are supposed to be taken." [R. 29].

Finally, the ALJ noted that Plaintiff's work activity in the first quarter of 2020 was also inconsistent with his allegations of disabling seizures. [R. 28]. The ALJ concluded: "Thus, the

neurology treatment records do not support the frequency of disabling seizures he alleges. They also do not document the claimant's alleged disabling effects after seizure of fatigue and altered mood lasting for days." [R. 28].

Finally, for the fourth step, the ALJ found Plaintiff could not perform his past relevant work but could work as a ticket taker, school bus attendant, or cashier. [R. 31–32]. The ALJ explained that considering Plaintiff's age, education, work experience, and RFC, Plaintiff was capable of adjusting to other work that existed in significant numbers in the national economy. [R. 32]. Ultimately, the ALJ found Plaintiff had not been disabled as defined in the Social Security Act from August 25, 2017 through the date of the decision. [R. 32].

## IV. DISCUSSION

The RFC is the ALJ's assessment, based on all relevant evidence, of a claimant's ability to work despite his or her impairments. *Lewis v. Callahan*, 125 F.3d 1436 (11th Cir. 1997). "Error arises only when the ALJ rejects medical evidence from the RFC 'without (at least) providing a good reason for doing so.'" *Felker v. Comm'r of Soc. Sec.*, No. 2:22-CV-221-KCD, 2023 WL 2986246, at *5 (M.D. Fla. Apr. 18, 2023) (quoting *Sneed v. Comm'r of Soc. Sec.*, No. 6:13-CV-1453-ORL-TBS, 2015 WL 1268257, at *7 (M.D. Fla. Mar. 19, 2015)). "The ALJ is not required to specifically discuss each piece of evidence so long as the decision shows that [s]he considered the claimant's condition as a whole." *Robinson v. Kijakazi*, No. 21-21603-CIV, 2022 WL 18155656, at *2 (S.D. Fla. Dec. 21, 2022), *report and recommendation adopted sub nom. Robinson v. Comm'r of Soc. Sec.*, No. 21-21603, 2023 WL 136556 (S.D. Fla. Jan. 9, 2023) (quoting *Alvarez v. Comm'r of Soc. Sec.*, 848 F. App'x 823, 824 (11th Cir. 2021)).

Here, Plaintiff argues the ALJ did not consider his limitations when determining his RFC. He points, for instance, to his statements that he suffered 3-6 seizures a month and Dr. Detyniecki's

opinion that Plaintiff needs to rest for 24 hours after seizure. [R. 647]. Plaintiff argues the ALJ should have asked the VE if Plaintiff could perform light work despite these limitations. Defendant responds the ALJ was not required to ask the VE about any unsupported limitations or accept VE testimony regarding unsupported limitations. Defendant also argues that Plaintiff has not met his burden of showing he cannot perform other work as a ticket taker, school bus attendant, and cashier. The ALJ's decision, Defendant asserts, should be affirmed because it is supported by substantial evidence.

Defendant is right. The ALJ rejected Dr. Detyniecki's opinion and Plaintiff's claims about the intensity, persistence, and limiting effects of his seizures. [R. 28]. The record shows that the ALJ considered Plaintiff's condition as a whole and provided good reason for rejecting Dr. Detyniecki's opinion. Thus, the ALJ was not required to pose additional hypotheticals. *See Wright v. Comm'r of Soc. Sec.*, 327 F. App'x 135, 137 (11th Cir. 2009) (explaining a hypothetical need not include every symptom alleged by a claimant). Moreover, she was not required to explain every piece of evidence, including the VE's testimony on absenteeism. *See Dyer v. Barnhart*, 395 F.3d 1206 (11th Cir. 2005) ("[T]here is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision . . . .").

The Eleventh Circuit has explained that, if the record shows that the claimant has a medically determinable impairment that could reasonably be expected to produce his symptoms, the ALJ must evaluate the intensity and persistence of the symptoms to determine how they limit his capacity for work. *Sims v. Comm'r of Soc. Sec.*, 706 F. App'x 595, 604 (11th Cir. 2017). In assessing such symptoms and effects, the ALJ must consider: "the objective medical evidence; the claimant's daily activities; the location, duration, frequency, and intensity of the claimant's symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects

of medication taken to relieve the symptoms; treatment, other than medication, for the symptoms; any other measure used to relieve the symptoms; and any other factors concerning functional limitations and restrictions due to the symptoms." *Id.* "If the ALJ determines that the claimant's statements about her symptoms are not credible, the ALJ must 'provide[ ] a detailed factual basis for his credibility determination,' which must be supported by substantial evidence. *Id.* (alteration in original) (quoting *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005)).

Here, the ALJ agreed that Plaintiff has a medically determinable impairment that could reasonably be expected to produce his symptoms, but she did not find credible Plaintiff's statements regarding the persistence and limiting effects of such symptoms. The ALJ then provided a detailed factual basis for her credibility determination. The record shows that the ALJ considered Plaintiff's detailed medical history, Plaintiff's statements about his past work and daily activities, Plaintiff's noncompliance with his medication, and more. [R. 25–30]. For instance, the ALJ noted that the neurological treatment notes did not document any post seizure symptoms to support Dr. Detyniecki's opinion that Plaintiff must rest for 24 hours after a seizure. [R. 30]. The ALJ also explained that Dr. Detyniecki's opinion that Plaintiff would miss four or more workdays per month due to his impairment or treatment was inconsistent with his treatment notes documenting the claimant's report of an average of only 2 to 3 convulsive type seizures per month. [R. 29]. And Plaintiff's 2019-2020 seizure logs showed he experienced mostly 1 to 2 grand mal seizures per month. [R. 30]. The ALJ noted that evidence of noncompliance with medication was inconsistent with Plaintiff's allegations that he was having seizures despite his taking the medications as prescribed. [R. 29]. Finally, the ALJ noted that Plaintiff's employment in the first quarter of 2020 was inconsistent with Plaintiff's allegations of disabling seizures.

Plaintiff appears to suggest that, even if the ALJ properly determined that Plaintiff's statements about the frequency of his seizures were not credible, she should have considered the limiting effects of even one seizure, particularly its effect on absenteeism. He relies on the VE's testimony that absenteeism is typically not allowed during the probationary period of employment and Dr. Detyniecki's opinion that he must rest for 24 hours after a seizure. But again, Plaintiff forgets the ALJ was not required to include this alleged limitation in her hypothetical if she did not find it credible. The ALJ expressly noted that Dr. Detyniecki's own treatment notes did not document any postictal symptoms to support that limitation. [R. 30]. She also expressly rejected Dr. Detyniecki's opinion that Plaintiff must take 5 to 6 breaks per hour due to profuse sweating because there was little, if any, evidence in the record of profuse sweating. [R. 29].

Because the ALJ provided specific reasons for discrediting Plaintiff's subjective complaints, and those reasons are supported by ample evidence, the Court finds that the ALJ properly rejected Plaintiff's allegations about the frequency, duration, and intensity of his symptoms. The Court respectfully **RECOMMENDS** that the Commissioner's denial of benefits be **AFFIRMED**.

## CONCLUSION

In conclusion, there is substantial evidentiary support for the ALJ's RFC evaluation. It is **RECOMMENDED** that Plaintiff's Motion for Summary Judgment [ECF No. 12] be **DENIED**, the Commissioner's Motion for Summary Judgment [ECF No. 14] be **GRANTED**, and the ALJ's decision be **AFFIRMED**.

Objections to this Report may be filed with the district judge within ten days of receipt of a copy of the Report. Failure to timely file objections will bar a *de novo* determination by the

district judge of anything in this Report and shall constitute a waiver of a party's "right to challenge on appeal the District Court's order based on unobjected-to factual and legal conclusions." 11th Cir. R. 3-1; *see also Harrigan v. Metro-Dade Police Dep't Station #4*, 977 F.3d 1185, 1191-92 (11th Cir. 2020); 28 U.S.C. § 636(b)(1)(C).

**SIGNED** this 6th day of June, 2023.

*[signature]*

LISETTE M. REID
UNITED STATES MAGISTRATE JUDGE

cc: **All Counsel of Record**